# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**PROPHET PAULCIN,**
**D.O.C. # W11537,**

      **Plaintiff,**

**vs.**                               **Case No. 4:19cv47-WS-MAF**

**M. KEY, A.R.N.P.,**

      **Defendant.**

                                    /

## THIRD REPORT AND RECOMMENDATION[1]

Pending in this case is Defendant Melanie Key's motion for summary judgment. ECF No. 113. Pro se Plaintiff Prophet Paulcin also filed his own summary judgment motion. ECF No. 120. The parties were advised of their obligations to respond to the opposing party's motion, and notified of this Local Rule 56.1(D) which governs when it is appropriate to file a reply. ECF No. 122. Subsequently, Defendant Key filed a supplement to her summary judgment motion, ECF No. 124, and a response to Plaintiff's

---

[1] The first Report and Recommendation, ECF No. 42-43, was entered on Plaintiff's motion for a temporary restraining order. The recommendation was adopted. ECF No. 48. A second Report and Recommendation was entered concerning Defendant Key's motion to dismiss, ECF No. 70. That recommendation was also adopted. ECF No. 73.

motion, ECF No. 126. Plaintiff then filed two responses to Defendant Key's motion, ECF Nos. 130-131, and Defendant Key filed a reply, ECF No. 132. Plaintiff then filed a motion for leave to supplement the record with exhibits, ECF No. 133, and his request was granted. ECF No. 134. The summary judgment motions are ready for a ruling.

**Plaintiff's Allegations**

This case challenges medical care provided to Plaintiff after he was transferred to Wakulla C.I. The fourth amended complaint [hereinafter "complaint"], ECF No. 35, alleges - as a matter of background information - that Plaintiff attempted suicide in September 2017. *Id.* at 8. As a result, Plaintiff says he suffers from several allegedly "permanent" injuries such as epilepsy, vision impairment, brain damage, and nerve damage. *Id.*

Plaintiff arrived at Wakulla C.I. on February 28, 2018. *Id.* He contends that Defendant Key discontinued Plaintiff's medications without evaluating him. *Id.* In particular, Plaintiff says that she discontinued his seizure medication and "progressive pain medication" which was for the nerve damage in his hands, feet, and knee. *Id.* She also "refused to renew Plaintiff's retinal hemorrhaging medications." *Id.*

Plaintiff contends that after submitting a sick call request in March 2018, he was evaluated by Defendant Key "for his epilepsy disorder." ECF No. 35 at 8. Plaintiff said she refused to renew his medications and also refused to provide him with pain medication. *Id.*

In April, Plaintiff submitted another sick call request to Defendant Key, complaining of "excruciating pain in his hands, feet, and knee," as well as unspecified "deteriorating health conditions." *Id.* The duty nurse saw Plaintiff in sick call, and also flagged his chart to be reviewed by Defendant Key. *Id.* at 9. Between April, May, and June, Plaintiff alleged that he "experienced multiple seizures." *Id.* Between June and July of 2018, Plaintiff alleged that Defendant Key evaluated him again for his seizure disorder, nerve damage, knee pain, and retinal hemorrhage. *Id.* He claimed that Defendant Key "persisted on her same medical course of action of deliberate indifference towards his serious medical needs." *Id.*

Although Plaintiff does not say when, he contends that he "informed Defendant Key that he was experiencing acute blindness, flashes in his eye, redness, irritation, swollen and intense pain due to light sensitivity, causing migrain [sic] headaches." *Id.* at 10. Plaintiff also said that he told Defendant Key about his "excruciating pain" in his hands and feet, which

Plaintiff claims was "caused by permanent nerve damage." ECF No. 35 at 10. He contends that the "failure to properly and promptly treat Plaintiff for said injuries" could cause other permanent injuries and "disuse of his hands and feet." *Id.* Plaintiff asserts that Defendant Key refused to provide treatment because Plaintiff had written "grievances against her." *Id.*

Plaintiff also alleges that in August 2018, he "again had multiple seizures." *Id.* His sick call request was answered by a duty nurse who recommended that his seizure medications be renewed. *Id.* Again, he said his chart was flagged and referred to Defendant Key. *Id.* Plaintiff said that he subsequently experienced up to five seizures per month between February 2018 and May of 2019. *Id.* He was given only over the counter pain pills from the nurses, but Plaintiff contends they "recommended further evaluation and treatment" at each incident. *Id.*

In April 2019 he suffered another seizure and was taken to medical on a stretcher. *Id.* at 11. Plaintiff said that after he was diagnosed with epilepsy disorder, he was "prescribed seizure medications and placed in the chronic illness clinic by a different physician." *Id.* He alleges that he suffers with permanent injuries which "are ongoing and continuous and will worsen" if he is not given "prompt treatment." *Id.* at 11.

Plaintiff also claims that because Defendant Key stopped his seizure medication, he was denied the benefit of a "compatible cellmate" who could provide assistance to Plaintiff during a seizure.  *Id.* at 9.  He contends that a proper cellmate would have "prevented the extensive damage Plaintiff sustained."  *Id.*

Plaintiff sued Defendant Key in her individual and official capacities. ECF No. 35 at 12.  As relief, he sought declaratory and injunctive relief, as well as compensatory, punitive, and nominal damages.  *Id.* at 14.

**History**

Defendant Key previously filed a motion to dismiss. ECF No. 55.  The motion was granted in part and denied in part.  ECF Nos. 70, 73.  Plaintiff's requests for declaratory and injunctive relief were dismissed, but the motion was otherwise denied.  *Id.*  The case proceeds on Plaintiff's request for monetary damages.  ECF No. 35 at 14.

**Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp.</u>, 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[2] the court "that there is an absence of evidence to support the nonmoving party's case."  <u>Id.</u> at 325, 106 S. Ct. at 2554.

An issue of fact is "material" if it could affect the outcome of the case. <u>Hickson Corp. v. Northern Crossarm Co., Inc.</u>, 357 F.3d 1256, 1259 (11th

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), <i>cert. denied</i> 522 U.S. 1126 (1998) (quoting <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

Cir. 2004) (citations omitted).  A party must show more than the existence

of a "metaphysical doubt" regarding the material facts, <u>Matsushita Elec.</u>

<u>Indus. Co., LTD. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct.

1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is

insufficient.  The court must decide "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law."  <u>Hickson Corp.</u>,

357 F.3d at 1260 (quoting <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 252,

106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

    "Summary judgment is not a time for fact-finding; that task is reserved

for trial."  <u>Sconiers v. Lockhart</u>, 946 F.3d 1256, 1263 (11th Cir. 2020) (citing

<u>Tolan v. Cotton</u>, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895

(2014)).  Specific facts pled in a sworn complaint[3] and supported by record

evidence must be credited to the Plaintiff, and all reasonable inferences

must be resolved in the light most favorable to the nonmoving party.

<u>Sconiers</u>, 946 F.3d at 1262-63.  However, "when competing narratives

emerge on key events, courts are not at liberty to pick which side they think

---

[3] The allegations presented in Plaintiff's fourth amended complaint were sworn under penalty of perjury.  ECF No. 35 at 13.

is more credible." 946 F.3d at 1263. On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., 475 U.S. at 587 (internal quotation marks omitted) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (quoted in Sears v. Roberts, 922 F.3d 1199, 1205 (11th Cir. 2019)).

"Cross motions for summary judgment do not change the standard." Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008). "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979)) (quoted in Ernie Haire Ford, 541 F. Supp.

2d at 1297-98)).  Thus, each motion for summary judgment has been separately evaluated.

## Relevant Rule 56 Evidence[4]

Plaintiff's medical records reveal he has a history of mental health issues for which he was provided medication.  ECF No. 120 at 82.[5]  It is unclear when that medication was changed or cancelled, but in August of 2017, Plaintiff requested to be "placed back on [his] psych meds," stating that he was "not suicidal at" that time but was hearing voices and needed to see someone.  *Id.*  He said he had not received his medications since arriving at Martin C.I.  *Id.*  The request was denied by T. Rawson, P.A..  *Id.* The response stated: "You refused[6] medication at TCU and it will not be prescribed to you at this time."  *Id.*

---

[4] In general, Plaintiff's motion for summary judgment asserts several facts which are not supported by the record evidence.  Federal Rule of Civil Procedure 56(c) requires a party asserting a fact to support that assertion by citing to specific materials in the record.  Discrepancies between factual assertions made in the statement of facts and facts supported by the record have not gone unnoticed.

[5] Plaintiff provided a multitude of exhibits with his summary judgment motion.  ECF No. 120.  Plaintiff did not, however, provide any pinpoint citations to the approximately 140 pages of exhibits.  *Id.*  He was previously informed that he "must include pinpoint citations to the record evidence supporting each factual assertion."  ECF No. 122 at 7 (quoting N.D. Fla. Loc. R. 56.1(F)).

[6] Another record from October 19, 2017, also indicates Plaintiff was "refusing meds." ECF No. 120 at 113-114.  The record indicates: "meds encouraged," and Plaintiff "said he will think about it."  *Id.* at 114.

Case No. 4:19cv47-WS-MAF

On September 20, 2017, Plaintiff submitted another request for his
"psychotropic medications," stating he was "hearing voices, having suicidal
ideation" along with uncontrollable crying, and "manic depression." *Id.* at
83. Plaintiff said he did not want to talk to anyone, he just wanted his
"meds renewed." *Id.* He said he came to the institution "on meds" and was
told to be "be patient," that his "meds [were] forthcoming." *Id.* The
response informed Plaintiff he would be scheduled for an appointment to
discuss his concerns. *Id.*

Plaintiff was hospitalized the following day,[7] and remained in the
hospital from September 21, 2017, through September 27, 2017. ECF No.
120 at 26. He was diagnosed primarily with acute respiratory failure, but
also: adult respiratory distress syndrome, aspiration pneumonia of both
lungs, acute respiratory acidosis, metabolic acidosis, acute kidney injury,
traumatic rhabdomyolysis, sepsis, and an "altered mental status." *Id.*

---

[7] The medical records indicate Plaintiff "attempted suicide by overdosing on pills" the
evening of September 20, 2017. ECF No. 120 at 59, 68, and 118.

Plaintiff explained in an inmate sick call request[8] that he "attempted suicide by overdosing on pills."  ECF No. 120 at 59.  He stated that when he awoke from a "medically induced coma," he was "blind" in his right eye. *Id.*  He asked whether he was still scheduled to see an eye doctor.  *Id.*

On October 25, 2017, Plaintiff was taken to South Lake Hospital for a CT Scan due to right eye blindness and pain.  Plaintiff's Ex. G (ECF No. 131 at 32-35).  The CT Scan was normal.  ECF No. 120 at 36.  There was "no evidence of acute infarction, mass, or hemorrhage."  ECF No. 120 at 40, 42.  Further, "[t]he brain parenchyma [was] normal for the patient's age."  *Id.* at 40, 42.  Plaintiff was instructed to "follow up with an Ophthalmologist as soon as possible."  *Id.* at 55.

Plaintiff was seen in the Magruder Eye Institute on October 31, 2017, and again on November 1, 2017, for a retina consult.  ECF No. 120 at 43-44, 50.[9]  The problems listed were eye floaters for the past month, with a

---

[8] That form was dated by Plaintiff on 9-16-17.  ECF No. 120 at 59.  However, because Plaintiff said that his problems started on 9-20-17, and a stamp on the form indicates it was received on 10-16, it is presumed Plaintiff misdated the form and it was actually written on October 16, 2017.  *Id.*

[9] It appears Plaintiff was seen on both dates, with the first appointment for the hemorrhage and Horner's Syndrome, and the second appointment included eye floaters as well.  ECF No. 120 at 50, 43.  It also appears that a consultation request for the first appointment was submitted on October 25, 2017, as an "acute" request.  *Id.* at 78.

history of vitreous hemorrhage in the right eye, and Horner's Syndrome.

*Id.* at 43-44.  The treatment notes for October 31st state Plaintiff was being

evaluated for "sudden vision loss after an overdose of an unknown

substance on Sept. 20 2017."  ECF No. 120 at 51.  The record indicates:

"rule out Retinal Detatchment [sic], Ischemic Optic Neuropathy."  ECF No.

131 at 35.  Plaintiff's sudden loss of vision was in the right eye only, the

"episode [was] constant," and the severity of the condition was listed as

"severe."  *Id.*  Plaintiff complained of "some right eye pain" as well as

"blurry vision."  *Id.* at 32, 35.  The plan was to monitor the Horner's

Syndrome and have an "urgent" follow up the next day concerning the

vitreous hemorrhage.  *Id.* at 53.  Plaintiff was "warned of blurred vision"

because his eyes were dilated, and the record indicates he was

"offered/advised to wear sunglasses."  ECF No. 120 at 52.

When Plaintiff returned the following day,[10] the record indicates he

was "doing well" and his vision was "stable."  ECF No. 131 at 44.  Plaintiff

complained of an "ache and light sensitivity," but the notes indicate he was

not experiencing "pain or tearing, no red eye and no shadow, curtain or

---

[10] Plaintiff was examined by Dr. John T. Lehr, a retinal specialist, on November 1, 2017.  ECF No. 120 at 48 (explained in ECF No. 124 at 2).

veil." *Id.* Plaintiff was advised that the vitreous hemorrhage "should resolve" and no treatment was needed. *Id.* at 48. The plan was to continue observing the eye floaters, but Plaintiff was advised to "report immediately" if he had "worsening floaters, flashes, acuity, or curtain over vision." *Id.* A follow up appointment was recommended for "2 weeks." *Id.*

A consultation request was submitted in mid-November 2017, stating Plaintiff was in need of a follow-up with the Eye Institute for vitreous hemorrhage and Horner's Syndrome. ECF No. 120 at 78. The request noted Plaintiff had "lost vision to OD"[11] and had "associated floater." *Id.* Dr. Noel submitted the request on November 11th, but the form does not include an authorization or an appointment date. *Id.*

On January 17, 2018, a "seizure protocol form" was completed after Plaintiff reported having a seizure. ECF No. 120 at 104. The seizure was not witnessed by staff or inmates. *Id.* The form shows Plaintiff had a history of mental health issues and had a currently prescription for Tegretol and Paxil. *Id.* Plaintiff had not been diagnosed with epilepsy, had not experienced an aura or had such a history, and had not had a recent head injury. *Id.*; *see also* ECF No. 113-1 at 42. Furthermore, Plaintiff did not

---

[11] Presumably, OD stands for overdose.

lose consciousness, experienced no incontinence, diaphoresis, or apnea.

*Id.* No injuries were noted. *Id.* Notwithstanding, a 30-day prescription was

issued for Keppra,[12] 500 mg, by P.A. Molina on January 17, 2018, for

"convulsion unspecified." ECF No. 113-1 at 29.

On February 7, 2018, prison officials at Charlotte C.I. responded to a

formal grievance Plaintiff submitted about sunshades. ECF No. 120 at

143, 145. Plaintiff complained that he had been given a pair of shades, but

they had not been returned to him after he went to "psych at Lake in

November 2017." *Id.* at 143. Plaintiff said he had a pass for the shades

and needed them for pain, irritation, and redness in his eyes. *Id.* The

grievance was denied, and Dr. Williams advised that no passes were found

in Plaintiff's "file for sunglasses nor a prescription." *Id.* at 145. Plaintiff was

---

[12] Notably, Plaintiff claimed in his summary judgment motion that he was first
prescribed Keppra for 7 days on October 31, 2017, and was diagnosed with epilepsy.
ECF No. 120 at 2. Plaintiff cited to a lengthy exhibit for that asserted fact, but the Court
has not been able to verify it because Plaintiff did not include a pinpoint citation as
required by Local Rule 56.1(F). Judges "are not archaeologists" and "need not
excavate masses of papers in search of revealing tidbits—not only because the rules of
procedure place the burden on the litigants, but also because their time is scarce." Nw.
Nat. Ins. Co. v. Baltes, 15 F.3d 660, 662-63 (7th Cir. 1994).

advised that he should discuss the issue at his upcoming appointment with the provider.[13]  *Id.*

On February 28, 2018, Plaintiff was transferred to Wakulla Correctional Institution.  ECF No. 113, Ex. A at 1-4.  At the time of his transfer, he had prescriptions for Tegretol[14] and Paxil.[15]  *Id.* at 2.  The Health Information Transfer form states those medications were "permanent."  *Id.*  He did not have any pending medical, dental, or mental health appointments, no upcoming referrals, and voiced no medical complaints.  *Id.*  Plaintiff also said that he was not "presently thinking about suicide," *id.*, but it was noted that Plaintiff had a history of self-injurious behavior.  *Id.* at 3.

---

[13] Plaintiff filed a formal grievance on this issue.  ECF No. 120 at 150.  The response to his grievance reveals that Plaintiff had an appointment scheduled with a retinal specialist in December of 2017, but when he was transferred to Charlotte C.I., the "appointment had to be rescheduled."  ECF No. 120 at 149.  It appears that the appointment was rescheduled, but then Plaintiff was transferred a second time to Wakulla C.I., and he was directed to follow up there and could then be advised of his "next scheduled appointment."  *Id.*

[14] Plaintiff was prescribed Tegretol by a psychiatrist on January 10, 2017, for his reports of mood fluctuations.  ECF No. 113, Ex. A at 47-48.  Tegretol is also used to prevent and control seizures.  ECF No. 113 at 3.

[15] The "seizure protocol form" from January 2018 also confirms Plaintiff was on those two medications only.  ECF No. 120 at 104.

On the same day he arrived, Plaintiff submitted a request for sick call, stating that he was supposed to have been seen by a "retinal specialist" for "retinal hemorrhaging" and an eye infection that Plaintiff said was causing him "intense pain." ECF No. 113-1 at 5. Plaintiff also complained that he had "intense pain in both" feet from nerve damage, and said the pain was "crippling." *Id.* Plaintiff also reported that he was supposed to see the doctor for nerve damage in his hands but he was transferred. *Id.* His request was received by Nurse K. Myers, an R.N., on March 5, 2018, and he was evaluated on March 8, 2018. *Id.*

The treatment notes reveal Nurse Myers saw "no signs/symptoms of an eye infection." ECF No. 113-1 at 6. Nurse Myers did find a "note" from an outside medical provider, Eye Associates, that Plaintiff was supposed to have a "follow up" in 7 weeks, but no documentation about a follow up was found. *Id.* Nurse Myers noted that Plaintiff would be referred for a "follow up." *Id.*

As for Plaintiff's complaints of pain in his feet and hands, Nurse Myers found "no objective signs of pain" when he was walking, flexing, or extending his hands and feet. *Id.* Nurse Myers gave him "10 packets" of Ibuprofen with an analgesic balm and instructed him on the use of a warm

compress.  *Id.*  He was told to return to medical if his symptoms worsened or he had new concerns.  *Id.*

Plaintiff submitted an additional sick call request on March 13, 2018, complaining that he "had several minor seizures since [his] meds" were "discontinued" at Wakulla C.I.  ECF No. 120 at 86.  He reported that he had been on "Kepplar[16] seizure meds" and he asked that it be renewed.  *Id.*  In addition, he requested sinus medications be renewed.  *Id.*  His request was received by Nurse Myers on March 14th, and he was seen on March 15, 2018.  *Id.*; *see also* ECF No. 120 at 87.

It was at the March 15th appointment that Plaintiff was first seen by the Defendant, Nurse Key.  ECF No. 120 at 87; ECF No. 113-1 at 9.  Nurse Key is an Advanced Practice Registered Nurse and worked at Wakulla Correctional Institution at the time of the events at issue.  ECF No. 113-2 at 1.  Prior to this visit, Nurse Key had reviewed Plaintiff's health transfer forms and medical chart on March 5, 2018.  ECF No. 113-2 at 3.  She noted that he had been given "a 30-day prescription of Keppra in January 2018, but his medical records did not indicate an ongoing seizure disorder."

---

[16] It is obvious that Plaintiff meant he had been on "Keppra," a "medication used in the treatment of seizures."  ECF No. 113-2 at 2, ¶9.

*Id.* In her opinion, "Mr. Paulcin's medical records did not indicate a medical basis for renewing the Keppra prescription." *Id.* Defendant Key's declaration explains that "Keppra is a medication used in the treatment of seizures." ECF No. 113-2 at 2. "Keppra should not be prescribed in the absence of a clear medical need because the harmful effects of the drug could outweigh any benefits." *Id.* She noted that he "had only reported unwitnessed seizures." *Id.* She did, however, believe that he should be referred to the Chronic Illness Clinic "for further monitoring." *Id.* Furthermore, she found that Plaintiff had recently been given an increased dose of Tegretol, which is "also a medication that can be used to treat seizures, neuropathic pain, and bipolar disorder."[17] *Id.* at 3.

During Plaintiff's examination on March 15, 2018, she noted "a vitreous hemorrhage in his eye." ECF No. 113-2 at 3. Plaintiff said he was supposed to have a follow up appointment with an eye specialist and wanted to check on that appointment. ECF No. 120 at 87. However, he said that he did not want to be transferred to Lake Butler at that time because he was "doing legal work on his case right now" and wanted to go

---

[17] It appears Plaintiff was diagnosed with bipolar disorder in May 2017. ECF No. 120 at 64. That medical record also disclosed that Plaintiff "utilize[d] mental health for reasons of secondary gain." *Id.*

after he completed that work.  *Id.*  Plaintiff's chronological health care record[18] noted the "vitreous hemorrhage" but stated Plaintiff refused a consult with an opthamologist or retinal specialist.  *Id.*  The record also notes that the consequences of his refusal was explained to Plaintiff.  *Id.*  Nevertheless, Plaintiff signed a "refusal of health care services" on March 15, 2018.  ECF No. 120 at 88.  His refusal was witnessed by Defendant Key and Nurse M. Gusman, an LPN.  *Id.*  Plaintiff has acknowledged his refusal in his affidavit, ECF No. 120 at 162, submitted with his summary judgment motion.  *See* Plaintiff's Ex. E (ECF No. 120 at 161-164).

Plaintiff also states in his affidavit that he personally conveyed his medical history to Defendant Key.  ECF No. 120 at 162.  He explained the circumstances of his overdose, his injuries, diagnoses, and prescriptions.  *Id.*  He also reported his "excruciating pain" and requested "effective pain meds."  *Id.*  He said that Defendant Key told him "she would renew [his] Keppra and prescribe effective pain meds," but he said she "did not."  *Id.*

The following day, Plaintiff submitted another inmate sick call request.  ECF No. 120 at 89.  He reported having "intense pain" in his

---

[18]    Another medical record for that day reveals Plaintiff was also evaluated for his complaint of allergies and nasal discharge.  ECF No. 113-1 at 9.  Plaintiff had a cough, sinus pain, itchy and watery eyes, sneezing, and a runny nose.  *Id.*

hands and feet, a sinus infection, migraine headaches, nose bleed, and sore throat. *Id.* He also said that he had seizures since being taken off his seizure meds and requested that he be given his "meds back please." *Id.* Plaintiff said the Tagretol did not "work to counter [his] seizures." *Id.* Nurse Myers received his request and Plaintiff was scheduled to be seen on March 29, 2018. *Id.*

Before he could be seen, Plaintiff submitted another sick call request form, reporting that he had experienced "at least five" seizures since he was taken off his meds. ECF No. 120 at 90. He asked to given his meds, stating he was "experiencing disorientation, lost [sic] of consciousness, seizing of [his] brain and body." *Id.* Again, Nurse Myers reviewed his request and noted that Plaintiff was scheduled to be seen on March 29, 2018. *Id.*

Plaintiff was evaluated by Nurse Myers on that date. *Id.* at 96. She noted that Plaintiff reported having a seizure within the past two weeks, but he did not call for assistance and the seizure "was not witnessed." *Id.* He requested being given Keppra again, and Nurse Myers referred Plaintiff to the "clinician." *Id.* A notation in Plaintiff's chart from Nurse Myers said that she "previously discussed starting inmate back on Keppra [with] Nurse

Practitioner [and] will rediscuss [with] her again." *Id.* Plaintiff was given 10

packets of Ibuprofen and analgesic balm. *Id.* He also was informed that

he needed to call when he had a seizure so he could "get appropriate

medical care." *Id.*

On April 15, 2018, Plaintiff submitted another sick call request. ECF

No. 120 at 95. He explained his retinal hemorrhage issue and said he had

been instructed to "keep tinted shades over [his] eye." *Id.* He requested a

medical pass which would permit him to wear "tinted shades as medically

instructed." *Id.* Plaintiff claimed that he had "a legitimate medical pass

from the retinal specialist to wear tinted glasses 24/7." *Id.* That request

was received by Nurse Myers and Plaintiff was scheduled to be seen on

April 17, 2018. *Id.*

On April 15, 2018, Plaintiff submitted an informal grievance to the

Assistant Warden. ECF No. 120 at 122. Plaintiff said that he had a

"legitimate pass" from the "outside retina specialist" which directed him to

wear tinted shades "at all times to protect" his eyes. *Id.* He further said

that he had already submitted a sick call request concerning the issue, but

claimed the "Nurse Practitioner will not issue or honor" the pass. *Id.* The

grievance was denied on April 19, 2018, and Plaintiff was informed it was a "sick call issue." *Id.*

On the following day, April 16th, Plaintiff submitted another request complaining about "intense pain in [his] left knee." ECF No. 120 at 97. He said he injured it "a few months back" and it sometimes "locks up" so that he can't move it. *Id.* Plaintiff said there was an audible sound when his "joints pop out of place." *Id.* Nurse Myers scheduled Plaintiff to be seen on April 18, 2018. *Id.*

Notwithstanding, the evidence reveals Plaintiff was seen on April 17, 2018, by Nurse Myers. ECF No. 120 at 109. Plaintiff said that the retinal specialist had instructed him "to wear tinted shades to protect" his eyes from light and rays. *Id.* He complained about constant headaches, redness, and tear irritation to his eyes. *Id.* Nurse Myers advised Plaintiff that he was scheduled "to see optometry soon." *Id.* It appears that Nurse Myers told Plaintiff that if his request for a tinted shades pass was granted, it would "most likely . . . be for only outside." *Id.* A notation in his chart also

states that the clinician "might wait until" Plaintiff's optometry appointment[19]

to "view recommendations."  *Id.*

Plaintiff was seen by Defendant Key for a second time on April 20,

2018.  ECF No. 120 at 98.  Defendant Key examined him for his complaints

of "left knee pain and visual disturbance."  ECF No. 113-2 at 4.  She noted

"crepitus, which is a grating sound/sensation and stiffness," so she

scheduled an x-ray to further evaluate his knee pain.  *Id.*; *see also* ECF No.

120 at 98.  Defendant Key denied his request for a sunglasses pass

because, in her "medical judgment, Mr. Paulcin's condition did not warrant

the issuance of a tinted sunglass pass."  ECF No. 113-2 at 4.  She also

advised that "DOC policy does not permit sunglasses to be worn inside due

to safety concerns."  *Id.*

Plaintiff has declared that he once again renewed his request "to be

treated by an optometrist for [his] retinal hemorrhage."  ECF No. 120 at

162.  He also complained that he was in "extreme pain" and needed

"effective pain meds."  *Id.*  Plaintiff further said his "epilepsy disorder was

worsening."  *Id.*  Plaintiff states that Defendant Key told him if he "continued

---

[19] Plaintiff acknowledges that "sick call nurses are responsible for scheduling doctor's appointment[s]."  ECF No. 131 at 2.

to write grievances against her she would not prescribe any treatment" for him.  *Id.* at 162-163.

Defendant Key submitted a supplemental declaration in which she states that she "did not refuse to treat Mr. Paulcin because of his grievances."  ECF No. 126-2 at 3.  She also declares that she "was not personally aware of Mr. Paulcin's grievance activity" because grievances "are run through the health services administrator's office."  *Id.*  She states that she "did not personally address, review, or respond to inmate grievances."  *Id.*

Plaintiff submitted an informal grievance about the denial of the sunglasses pass on April 19, 2018.  ECF No. 113-1 at 20; ECF No. 120 at 109.  It was denied by Health Services Administrator E. Hand on April 24, 2018.  *Id.*  Plaintiff then submitted a formal grievance about that issue, but that grievance was also denied on April 24, 2018.  ECF No. 113-1 at 20.

From that point forward, Plaintiff had interactions with other medical providers, but Defendant Key did not treat Plaintiff or review his medical chart after the April 20th visit.  ECF No. 113-2 at 4.  Indeed, the record shows Plaintiff had multiple visits with medical providers during an approximate seven month period of time (between February 2018 and

August 2018), but his involvement with Nurse Key was limited to two occasions - March 15, 2018, and April 20, 2018. ECF No. 113-2 at 2-4.

Nurse Key did, however, review Plaintiff's medical chart two more times. ECF No. 113-2 at 4-5. On June 15, 2018, she reviewed the notes of an "outside provider,"[20] and on June 19, 2018, after a "use-of-force" incident, she reviewed his "emergency room records to determine if any follow-up treatment was required." *Id.* at 5.

In late May 2018, Plaintiff was evaluated after declaring a "psych emergency." ECF No. 113-1 at 33. Plaintiff said he intended to kill himself, and "was in possession of 2 razor blades." *Id.* He said he would resort "to attempting to hang himself if he couldn't use the razor blades." *Id.* It was recommended that Plaintiff be admitted to the "SHOS, and an order was written by M. Hall ARNP at 9:58 am, 5/25/2018." *Id.*

On June 1, 2018, Plaintiff was evaluated by mental health provider and reported "struggling bad." *Id.* at 34. He complained that he was "forced" to "accept a roommate." *Id.*

---

[20] Defendant Key states that it "is customary for medical providers to review the notes of outside providers because outside providers can only make recommendations for treatment." ECF No. 113-2 at 4-5.

Case No. 4:19cv47-WS-MAF

In July 2018, Plaintiff complained about pain from the alleged nerve damage in his feet and arms. ECF No. 120 at 103. The medical records indicate his chart was "referred to provider for" prescription renewals. *Id.* It also appears that Plaintiff complained about eye discomfort as well because the health care chart states that Plaintiff was informed they did not have "Visine eye drops"[21] and he should try the canteen. *Id.*

Plaintiff's affidavit states that he experienced seizures from March 2018 through May of 2019. ECF No. 120 at 163. He contends that he would suffer paralysis, involuntary discharge of bodily fluids, humiliation, temporary memory loss, brain damage, abrasions, bleeding, and swelling. *Id.* He contends Defendant Key never evaluated him for, or properly submitted the "necessary paperwork" for Plaintiff to be placed in the Chronic Illness Clinic [CIC].[22] *Id.* He also states that between June and

---

[21] It appears from an informal grievance Plaintiff submitted in late May 2018, that at one point Plaintiff did have an "order" for Visine eye drops. ECF No. 120 at 124. Plaintiff complained that he had been without the drops for over two months and was told it was "on back order." *Id.* He said he needed the refill. *Id.* A response was provided by Health Service Administrator E. Hand: "Your order is expired, this remains a sick call issue." *Id.* The informal grievance was denied. *Id.*

[22] Contrary to that assertion, Plaintiff acknowledges that he and Defendant Key "discussed" the CIC, and her medical opinion was that Plaintiff "should be referred to the CIC for further monitoring" since he had been prescribed Keppra for 30 days. ECF No. 113-2 at 3; ECF No. 131 at 3. Plaintiff's own evidence reveals that he is seen in the CIC on a regular basis. ECF No. 133. He was seen in June 2019, in November 2019,

December 2018, he would see Defendant Key in passing and request medical treatment from her. *Id.* Plaintiff states that she would respond by telling him she was "not going to prescribe" any medical treatment for him because Plaintiff "had continued to write grievances against her." *Id.*

Defendant Key's declaration states that she "did not treat Mr. Paulcin for seizures during either" of her examinations because he "did not discuss his seizures with [her] or otherwise voice complaints about any symptoms associated with seizures." *Id.* at 2.

In April 2019, Plaintiff had a "witnessed seizure." ECF No. 131 at 22; ECF No. 126-1 at 27. Plaintiff had no memory of the event, and no injuries were noted. *Id.* Dr. Acosta ordered an increase in Keppra for Plaintiff. *Id.*; *see also* ECF No. 126-1 at 27. Plaintiff was instructed to report "Aura's immediately," and any additional seizures. *Id.*

In May of 2019, the records show Plaintiff was complaining of "unwitnessed seizures." ECF No. 126-1 at 29. Plaintiff was also requesting that he be placed back on Tegretol, stating that Keppra was "causing nausea." *Id.* As of January 20, 2022, Plaintiff was "taking Keppra 750 mg twice a day for seizures." ECF No. 120 at 112.

---

in March of 2020, in November of 2020, May 2021, and November 2021. *Id.* at 4-8.

Case No. 4:19cv47-WS-MAF

Finally, a consultant's report in December 2019 shows that Plaintiff asked about having glasses with a tint. ECF No. 126-1 at 1. The optometrist noted that it was "not medically necessary." *Id.* The report shows Plaintiff reported being "blind," but was "20/20" with a minimal prescription. *Id.* A notation pointed to "possible [history] of malingering." *Id.*

**Analysis**

Defendant Key argues that Plaintiff's claim for deliberate indifference must fail. ECF No. 113 at 12. She contends that the evidence is undisputed and demonstrates she provided constitutionally adequate medical care to the Plaintiff. *Id.*

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison. Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)). "[B]asic human necessities include food, clothing, shelter,

sanitation, medical care, and personal safety."  <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1511 (11th Cir. 1991) (cited in <u>Collins v. Homestead Corr. Inst.</u>, 452 F.App'x 848, 850-851 (11th Cir. 2011)).

Deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment's prohibition against cruel and unusual punishment. <u>Estelle v. Gamble</u>, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003) (quotations omitted) (quoted in <u>Bingham v. Thomas</u>, 654 F.3d 1171, 1176 (11th Cir. 2011)).  "In either of these situations, the medical need must be 'one that, if left unattended, 'pos[es] a substantial risk of serious harm.'"  <u>Farrow</u>, 320 F.3d at 1243 (citation omitted); *see also* <u>Mann v. Taser Intern., Inc.</u>, 588 F.3d 1291, 1307 (11th Cir. 2009).  Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition" or "if left unattended, poses a substantial risk of serious harm."  <u>Mann</u>, 588 F.3d at 1307 (citations omitted).

Deliberate indifference requires more than negligence,[23] but it is unnecessary to show a defendant intended to cause harm.  Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994).  Deliberate indifference requires a plaintiff to show that a defendant was subjectively reckless and consciously disregarded a substantial risk of serious harm.  Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (explained in Farmer, 511 U.S. at 838-40, 114 S. Ct. at 1979-80).  "The inadvertent or negligent failure to provide adequate medical care 'cannot be said to constitute 'an unnecessary and wanton infliction of pain.'"  Estelle, 429 U.S. at 105-06, 97 S.Ct. 285 (quoted in Farrow, 320 F.3d at 1243).

In a claim for the denial of medical care, a plaintiff must show four elements: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000), cert. denied, 531 U.S. 1077 (2001); Farrow,

---

[23] "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all."  Bingham, 654 F.3d at 1176 (citing Brown v. Johnson, 387 F.3d 1344, 1451 (11th Cir. 2004)).

320 F.3d at 1243.  Put another way, to show a defendant acted with deliberate indifference, "a prisoner must show the prison official's: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.'" Bingham, 654 F.3d at 1176 (quoting Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)).

"However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' " McElligott, 182 F.3d at 1254 (citation omitted) (quoted in Farrow, 320 F.3d at 1243.  For example, medical malpractice does not constitute deliberate indifference.  Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." Harris, 941 F.2d at 1505 (citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989)).  "A 'complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'" Estelle, 429 U.S. at 106, 97 S.Ct. at 292 (quoted in Bingham, 654 F.3d at 1176).  For example, the prisoner in Estelle received

treatment for his back injury, but complained that more should have been

done in the way of diagnosis.  The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic
> techniques or forms of treatment--is indicated is a classic
> example of a matter for medical judgment.  A medical decision
> not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.  Put simply, an "official acts with

deliberate indifference when he or she knows that an inmate is in serious

need of medical care, but he fails or refuses to obtain medical treatment for

the inmate."  McElligott, 182 F.3d at 1255 (citations omitted).  An inmate

bringing an Eighth Amendment claim for  deliberate indifference faces "an

appropriately high bar" because officials will "be found free from liability if

they responded reasonably to the risk" of harm.  Swain v. Junior, 961 F.3d

1276, 1285-86 (11th Cir. 2020) (concluding that defendants were not

deliberately indifferent in their response to the COVID-19 outbreak).

In this case, Defendant does not specifically address the first element

of an Eighth Amendment claim: whether or not Plaintiff had a "serious

medical need."  For his part, Plaintiff generically contends that Defendant

Key should have known from reviewing his medical chart that Plaintiff

"suffered a serious medical condition."  ECF No. 120 at 8.  Plaintiff does

not, however, specify which of his "medical ailments" constituted a "serious medical need." *Id.* at 8-9, 14. To the degree he argues that he has been diagnosed with an epilepsy disorder prior to his arrival at Wakulla C.I., *Id.* at 9, that is not supported by the evidence. Nevertheless, for present purposes, it will be accepted that Plaintiff's complaints of "intense" pain and his own reports of seizures constitutes a "serious medical need."

Because Plaintiff raises several separate and distinct basis for his Eighth Amendment claim against Defendant Key, each are addressed separately. The first consideration is to Plaintiff's argument that she improperly denied him a medication for seizures.

After Plaintiff was transferred to Wakulla C.I., he submitted a sick call request on March 13, 2018, which resulted in his first visit with Defendant Key. Plaintiff's request said that he had experienced "several minor seizures" since Keppra had been discontinued and he asked to have that medication renewed. First, the evidence reveals Defendant Key did not discontinue that medication. Instead, Keppra was prescribed on January 17, 2018, as a 30-day prescription. It expired prior to Plaintiff's arrival at Wakulla C.I.

Second, prior to her examination of Plaintiff, Defendant Key had reviewed his medical chart. She found no basis for issuing a new prescription for Keppra for four reasons: (1) Plaintiff had only reported unwitnessed seizures; (2) the January 17, 2018, chart notation said Plaintiff had not been diagnosed with epilepsy; (3) Keppra should not be prescribed absent a clear reason because of harmful side effects,[24] and (4) Plaintiff was currently on Tegretol, another drug which is used to treat seizures and neuropathic pain. Thus, Defendant Key found no medical indication that Plaintiff had a seizure disorder which necessitated a prescription for Keppra. Plaintiff's dissatisfaction with her decision is a classic example of an inmate's disagreement with a medical decision or medical "judgment." The Supreme Court rejected that as a basis for liability in Estelle. Hence, Defendant Key is entitled to summary judgment as to that issue.

The second issue Plaintiff raises concerns treatment for the vitreous hemorrhage in his right eye and Horner's Syndrome. Those problems occurred in October 2017. It is true that Plaintiff did not receive the follow up appointment that was recommended due to transfers. Defendant Key is

_____

[24] Indeed, Defendant Key points out that after Plaintiff was given a prescription for Keppra, Plaintiff requested that he be placed back on Tegretol because the Keppra was "causing nausea." ECF No. 126-1 at 29.

not responsible for that delay.  Moreover, the treatment notes from the Eye

Institute show the vitreous hemorrhage would resolve without treatment

and they were only going to monitor the floaters in his eye.  When Plaintiff

had an opportunity to be sent for treatment, he declined it, choosing

instead to stay at Wakulla C.I. and work on his legal work.  Plaintiff did so

against medical advice, including that of Defendant Key.  Although Plaintiff

argues that he did not refuse medical treatment, ECF No. 120 at 4, the

evidence is undisputed that he did.  The form Plaintiff acknowledges

signing was a "refusal of health care services" form.  *Id.* at 88.  It was not a

waiver to be transported as Plaintiff has argued.  *Id.* at 3-4.

Furthermore, Plaintiff also complained about not being provided

sunglasses and experiencing eye pain.  First, the only medical evidence

presented concerning the need for sunglasses was because his eyes were

dilated when he was at the Eye Institute.  ECF No. 120 at 52.  There is no

medical evidence which reveals an ongoing medical need for sunglasses,

nor has Plaintiff provided any medical records which demonstrate that he

was ever issued a sunglasses pass.  Further, a December 2019 medical

record shows Plaintiff asked an optometrist for glasses with a tint, and the

optometrist deemed it "not medically necessary."  ECF No. 126-1 at 1.

Also, Plaintiff's complaint about his eye issue was made on March 8, 2018, before his treatment by Defendant Key. Nurse Myers found no signs or symptoms of an eye infection but noted he would be scheduled for a "follow up" examination with an eye specialist. Defendant Key was not responsible for making those appointments as only sick call nurses do so.

Plaintiff made additional requests for "tinted shades" in April 2018, and those were submitted to Nurse Myers and the Assistant Warden. ECF No. 120 at 122. No action was taken on those requests, even when Plaintiff was seen on April 17, 2018, by Nurse Myers. Nurse Myers told Plaintiff he was scheduled "to see optometry soon."

When Defendant Key treated Plaintiff for the second time on April 20th, Plaintiff's request for a sunglasses pass was discussed, but she denied the request. Defendant Key has explained that the denial was pursuant to her medical judgment, finding Plaintiff's condition did not warrant the pass and, moreover, sunglasses could not be worn inside because of Department policy. As to this claim, Plaintiff has not come forward with evidence to show that he was experiencing a serious medical need concerning his eye problems during the time he was treated by Defendant Key, nor has he shown more than a desire for a comfort item.

Plaintiff disagrees with a medical judgment, and this is insufficient to support an Eighth Amendment claim. Defendant Key was not deliberately indifferent when denying Plaintiff's request for a sunglasses pass.[25]

A fourth issue raised by Plaintiff was the lack of treatment for his knee pain. The undisputed evidence shows that when Plaintiff was evaluated by Defendant Key in April 2018, she found "crepitus" and scheduled Plaintiff for an x-ray to properly evaluate his knee pain. Neither party has provided any subsequent medical records to show the result of the x-ray. Nevertheless, Defendant Key was not deliberately indifferent to Plaintiff's complaint of knee pain. She undertook diagnostic testing to determine the best course of action. Plaintiff was not evaluated further by Defendant Key, but there is no evidence that she ignored Plaintiff's complaint or refused to provide treatment.

Plaintiff did assert in his declaration that Defendant Key told him that if he "continued to write grievances against her she would not prescribe

---

[25] To the degree Plaintiff also complained about not being provided Visine, there is no evidence that Plaintiff requested Visine from Defendant Key. Although it could be assumed that the issue was raised when Plaintiff discussed his request for sunglassess, it is insufficient to support Plaintiff's Eighth Amendment claim. Judicial notice is taken that a prescription is not necessary to obtain Visine; it is an over the counter product and the evidence suggests that eye drops were available in the canteen.

any treatment" for him.  ECF No. 120 at 162-163.  Defendant denies

making that statement.  Nevertheless, this is not a dispute about a material

fact because there is no evidence to show that after April 2018, Defendant

Key refused to treat Plaintiff, denied him a prescription, or failed to provide

medical care.  Plaintiff was seen by numerous other medical providers after

April 20, 2018.[26]

In short, Defendant Key reviewed Plaintiff's medications and made a

medical decision that the two prescriptions he had when he arrived at

Wakulla Correctional Institution were sufficient.  Defendant Key sought to

refer Plaintiff to see an eye specialist, but Plaintiff refused that referral.

Defendant Key examined Plaintiff for his complaint about knee pain and

ordered x-rays to further diagnose the problem.  There is no evidence that

Defendant Key was deliberately indifferent to Plaintiff's medical issues.

Plaintiff's disagreement with her decisions to not prescribe Keppra or

_____

[26] Defendant Key asserted that she did not respond to Plaintiff's grievances and was unaware of any grievances Plaintiff submitted.  However, Plaintiff points out that grievances about medical issues are noted in Plaintiff's medical records and Defendant Key could review those records.  ECF No. 131 at 11.  Thus, he contends she would have at indirectly viewed his grievance activity.  *Id.*  Even so, the grievance notations in the record are generic about the issue grieved and do not reveal any statements Plaintiff made about any medical provider, including Defendant Key.  *See* ECF No. 120 at 98, 109; ECF No. 113-1 at 20, 23.  Moreover, Plaintiff has not shown that during any medical appointment or sick call visit Defendant Key refused to treat him.

provide him with a sunglass pass is insufficient to state an Eighth
Amendment claim. Defendant Key's motion for summary judgment, ECF
No. 113, should be granted and Plaintiff's motion for summary judgment,
ECF No. 120, should be denied.

## RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that
Defendant Key's motion for summary judgment, ECF No. 113, should be
**granted**, Plaintiff's motion for summary judgment, ECF No. 120, should be
**denied**, and judgment entered in favor of Defendant Key.

**IN CHAMBERS** at Tallahassee, Florida, on August 4, 2022.


 S/    Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**



## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this
Report and Recommendation, a party may serve and file specific written
objections to these proposed findings and recommendations. Fed. R.
Civ. P. 72(b)(2). A copy of the objections shall be served upon all other
parties. A party may respond to another party's objections within
fourteen (14) days after being served with a copy thereof. Fed. R. Civ.**

**P. 72(b)(2).** <u>**Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.**</u>  **If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**